*540
 
 Ruffin, C. J.
 

 The conviction seems to be a hard one ; and we own, we do not see enough in the evidence to support it. Up to Christmas 1846, nothing appears to have been done at the defendant’s house, tending to the corruption of the public morality. At Christmas 1845 there was a quilting, as it is called, and dancing by negroes in a negro quarter, accompanied by such noise as arises from a negro dance ; and it happened, that a daughter of the defendant was seen there and that some of the negroes did not belong to the defendant; but why the daughter went there, or how long she staid, or what she did, or how many strange negroes there were, or that they were unlawfully there, or that there was any drunkenness or drinking, or any thing else improper, did not appear. At another time, it is stated, that negroes, not belonging to the defendant, were in his negro quarters, and that a very great noise was made. But it is not stated, when that was, nor that those negroes were improperly there, nor that it was at an unseasonable hour, nor what was the nature or occasion of the noise. The case is, then, brought down to the affair of Christmas night 1846; and the question is, whether that constitutes the defendant the keeper of a disorderly house. According to the case of
 
 Mathews, 2
 
 Dev. and Bat. 424. it does not, as far as the collecting of people and their drinking go; for it was there held, that a private person, living half a mile from any other house and at a distance from a highway, was not guilty of keeping a disorderly house, though on two occasions he took in company for pay, who set up all night, played cards, and got drunk and committed affrays. The crimin • ality here, then,must consist, if in any thing, in th.e assemblage of negroes and their dancing and thereby making a noise — for no other kind of noise or disorder is suggested — and in the mingling of the two colors together in the same house and dance, as stated by the witness, Roberts. It would really be a'source of regret,'if con
 
 *541
 
 trary to common custom it were to be denied to slaves, in the intervals between their toils, to indulge in mirthful pastimes, or if it were unlawful for a master to permit them among his slaves, or to admit to the social enjoyment the slaves of others, by their consent. But it is, clearly, not so. The statute law recognises the usage, and only forbids under a penalty any person from permitting slaves to meet on his plantation to dance or drink, unless thejr have the n/ritten permission of the owner. When the law tolerates such merry makings among these people, it must be expected in the nature of things, that they will not enter into them with the quiet and composure, which distinguish the gaieties of a refined society, but with somewhat of that hearty and boisterous gladsomeness and loud laughs, which are usually displayed in rustic life, even where the peasantry are much in advance of our negroes in the power and habit of restraining the exhibition of a keen sense of such pleasures. One cannot well regard with severity the rude pranks of a laboring race, relaxing itself in frolic, though they may seem to some to be at times somewhat excessive. If slaves would do nothing, tending more to the corruption of their morals or to the annoyance of the whites, than seeking the exhiliration of their simple music and romping dances, they might be set down as an innocent and happy class. We may let them make the most of their idle hours, and may well make allowances for the noisy out-pourings of glad hearts, which providence bestows as a blessing on corporeal vigor united to a vacant mind. In the assemblage at the defendant’s there seems to have been nothing more ; no brawls, no profane swearing, nor other vicious disorder. It was but the dancing in a retired situation of the negroes of the plantation, to which the greater hilarity was probably imparted by the participation of a few otheis, who had been of the same family and by the leave of their owners came, at the sea
 
 *542
 
 .son of Christmas, to receive the affections belonging to the ties of kindred and former association. There was nothing contrary to morals or law in all that — adding, as it did, to human enjoyment, without hurt to any one, unless it be that one feel aggrieved, that these poor people should for á short space be happy at finding the authority of the master give place to his benignity, and at being freed from care and filled with gladness. Then, as to the ingredient, that the negroes were allowed to dance in their master’s dwelling house, and that some of the white people also joined in their dance. Taking the testimony for the State altogether, there is much question as to the truth of this last circumstance. But, supposing it to be so, we yet must say, though it be not according to the custom of this part of our country, that there is nothing in it forbidden by law — nothing that, of itself, can constitute a disorderly house. The presence of the family might be a safe guard against riotous conduct in the negroes. rather than authorise the inference, that it contributed to create disorder ; and it is very possible, that the chrildren of the family might in Christmas times, without the least impropriety, countenance the festivities of the old servants of the family by witnessing, and even mingling in them. As far as appears, it was but harmless merriment; which, indeed, is the character given to it by the concurring testimony of all those, who lived nearest to the defendant, and knew best the nature and periods of these merry-makings.
 

 Per Curiam.
 

 Judgment reversed and a
 
 venire de novo.